Please be seated. Welcome to the third day of the panel sitting for this month. We only have one case today. So preparations were a little easier than sometimes, but I'm sure the two of you are well-prepared as well. The case we're about to hear is United States v. Leah and Michael Hagen. Mr. Michelson. Those were my two choices and I messed up. So go ahead. May it please the court and counsel. I'm Franklin Mickelson and I represent Leah and Michael Hagen. Herb Kimball ran a call center that operated out of the Philippines. He would run television ads that would target elderly people that had orthopedic pain and encourage them to call 1-800 number. When they called his call center would interview them and determine whether they were Medicare eligible and could receive an orthopedic brace of some kind. If they were eligible, he would connect them with usually a telemedicine consult. They could also see their own doctor, but usually they would then call for a telemedicine consult and at that consult, usually the doctor would prescribe one or more orthopedic braces for these people. His operation would then complete the necessary paperwork and forward that to various DME providers around the country.  ostensibly for the marketing and paperwork processing for each order they received. That Hagen's is defensive trial is it boils down to their contention that disappeared legitimate and legal. Although they admitted that the effect of the contracts they had with Kimball's organization. What resulted in them effectively paying per doctor's order they received they contended because they understood that there was not a guarantee was not a guaranteed one-for-one exchange and because they were receiving legitimate marketing and BPO services that they thought this arrangement was legal. On the other hand, the government contended that the arrangement was a total sham from the get-go. Mr. Kimball himself after receiving an extraordinary plea bargain, which he would only receive probation, testified that from day one he and the Hagen's inspired to break the law. The first issue I'd like to talk about is the exclusion of the testimony of a health care attorney named Joshua Scora. To support their contention that the Kimball's operation they thought that Kimball's operation was legitimate. They sought to introduce the testimony of this health care attorney that Mr. Kimball had later asked to review the same contracts that he had entered in with the Hagen's. It wasn't the Hagen's had already entered into the contract, but the exact same forms were being reviewed. The Hagen's believed that this testimony would show that on its face this operation was not illegitimate and illegal. They were not attempting to be clear. They were not attempting to call the attorney to say they received legal advice from this attorney. Rather... Be clear or explicit to me. What is the relevance of this? It's not that he had approved the particular contracts. What is it that was key to Scora's testimony? The key thing was the Hagen's maintained that this was... that the contracts they had with Kimball were what... how they were doing business with Kimball. And that Mr. Scora looked at the same contracts and thought they were also legal. In short, the Hagen's contended that Kimball duped them into believing this was a legal and legitimate business and that he was even able to dupe a health care attorney from a prestigious law firm. How does that fit with the government's evidence that seemed to me not to challenge the legality of the contracts, but that the actual operation had little relevance to how the contracts were set out? Is that a fair characterization of the government's case? Well, I think the government's case was that the Hagen's were not believable when they said that they were doing business according to the contracts. There were emails between the Hagen's and some of Kimball's employees in which, rather than for the BPO services in particular, rather than the contract said you're supposed to get billed for the business processing services. How much money did your clients receive out of these transactions? I'm going to have to rely on rough numbers, but the total net was around $25 million, approximately. What span of time? A short period of time, frankly. Yes, I mean this... The difficulty I have with your argument is that almost on its face, it's very, very difficult for people to think that this is a legitimate enterprise of the evidence. So some piece of evidence admitted it's difficult for me to see the prejudice in it. The problem with the whole structure here reeks of fraud. I understand the court's view on that, and I'm certainly not making a case that... That's not my personal view. That's the narrative here that nobody really can contest. Well, the Hagen's contend and... They just fell into this. I'm sorry? They just lucked into this deal. In fairness to the Hagen's, the picture that they were trying to present to the jury and to the court was, look, yes, this was extremely lucrative for them. There's no denying that. But this was an operation that was advertised on television. This wasn't something done in the shadows. This was a business in which there were... I'm sorry, I don't remember, but lots of employees, offices. They went to the Philippines and met this guy. This guy put on his contracts. I've consulted with these lawyers. They thought it had the appearance of legitimacy. So I think it goes both ways. Just so I can understand, you're saying it was an abusive discretion to exclude Skora's testimony? Yes, sir. But you're not saying he was an expert witness? You're not saying this was advice of counsel? You're saying he was a fact witness? Yes, sir. Okay. So he had firsthand knowledge of what relevant fact and what would be particularly helpful would be, quote, from his proffer, where you said this is what he would have testified. What is the proffer statement that Skora made that was an abusive discretion to exclude? Did he ever say he was misled? No, sir. He did not. So what's the statement in his proffer that is the most favorable evidence you wanted to elicit that you were prevented from? In fairness, I would say it was the totality. It was the fact. I know, but that's not going to really get to abuse of discretion. Usually when a fact witness is excluded and he isn't offering hearsay, he's offering firsthand knowledge. You can pinpoint exactly what it is you most wanted him to say. I assume to impeach, but maybe to go to good faith. Not quite clear to me which it was. To go to good faith. To go to good faith. So what would he have said if he didn't, he was only engaged after the contracts that are relevant to this case came into place. But the proffer also says his understanding with Kimball was that whatever Kimball did, it would comply with federal regulations, correct? Yes. So what was excluded that he might have said? First, that I spoke with, essentially, I'm sorry, I can't quote it verbatim, but essentially, I spoke with Mr. Kimball. He wanted this operation to be legal. I looked at these contracts. They appeared. These other third-party contracts. Yes, but they were formed contracts. They were, the evidence is, it is clear that there was the same contracts and form that the Hagans entered in with Kimball. Didn't the district judge say, listen, if you can find a lawyer that your clients, the Hagans, had look, that testimony would be admissible? I, well, I thought the district court specifically said, listen, we can recall Kimball. You can ask him about relations with any lawyer. Plus, I thought the district court specifically said, if your clients had lawyers review the contracts at issue in this case, they can testify. The judge may have said that. I also don't specifically recall. The fact is, the Hagans did not have an attorney review these contracts. What, last quick question, and this, I appreciate your answers. What would be the case you would say is most analogous where we reversed an exclusion of a witness testimony? What case comes to mind? The one I cited in the brief, I, I, I mean, it's so, it's so fact-bound, I can't say that it's particularly compelling, but I'm sorry that I forgot. That's right. If it's in the brief. It's in the brief. Go ahead. I mean, in short, I mean, the contention is, the Hagans were trying to say, Kimball duped this attorney in the same way he duped us. In fairness, in total candor, the government's contention is, but you had, you weren't on, Kimball, Skora would not have known about how the payments were in fact made. So that's to me where there's, where the rub really is. If, if it would be clear to me, it would be 100% clear that this testimony should have come in if he said everything went according to these contracts, I looked at them and said they were legal to the exact same contracts. But what happened was the Hagans are saying, well, I thought they were ended up doing this sort of estimate thing where they would just say, look, it's roughly the business processing is going to cost X amount per order. That's to me where the Kimball had said, hey, what we're really doing is getting paid for doctor's orders. Well, that's what worse we would know, but instead it almost looks like he has these sham contracts that look really legitimate. Even the lawyer thought they looked legitimate, but the conversations with the co-conspirators are, well, it's actually a sham. And that is exactly, that is the judge's reasoning. But, but the problem with that is it becomes kind of a circular thing because you have to also account for the Hagans testimony saying that's not what he said and, and that's not how this went. Excuse me. One of the points you may be talking about, you used the earlier, is that Skor wasn't told by Kimball what was really going on, which supports that the Hagans weren't told by Kimball, get my name straight, of what really was going on. Is that, is that part of what you told the district court? Is the reason that this should be admitted? Yes, sir. Okay. I mean, there was, there was a lot, a lot of debate over this I think that's what the defense was trying to argue, that there was a constant back and forth that the government would say this is an improper reliance on counsel argument, and the defense would vociferously say we are not trying to assert reliance on counsel. I should cover one of your other issues. Okay. Let me, let me go to the safe harbor instruction, which has a sort of similar in a way, but there, there is a tandem part to the exclusion of the witness. You also alleged error in excluding documents. Yes. Do you, do you agree in terms of your brief, it's difficult to know which specific document you said, document by document, it's more of an in-toto? It is in-toto, in fairness. So there's, I wouldn't, to be candid with the court, I don't think there's like this document that's like, you know, a silver bullet for the defense or, it was the in-toto. This is what I was looking at. These are the contracts. They all had this aura of legitimacy. This is a legitimate attorney talking to this guy. And I will find in your brief, this piece of evidence was excluded erroneously, document by document. I just cited all the exhibits they tried to put in with discourse testimony. In relation to the safe harbor instruction, I think the issue here is, was there, was the evidence sufficient to raise a factual issue? Now, to be fair, the instruction says it's an affirmative defense and it was properly cited by the defense and it would have to prove by preponderance. But the Hagans testified that they, the BPO agreement did appear to fit the safe harbor requirements and they requested that instruction. The government contends that because the marketing agreement was not subject to the safe harbor provision because it's explicitly was a payment for the number of referrals that it has to be both in order to justify the safe harbor provision. But this all gets rather legalistic. I think there are two entities there. So I think under the regulations, that's not required and it wouldn't have been, I think this was again, the district court is basically supplanting the jury's judgment on this. Would that have caused them to find in your favor on some counts that was completely independent of all the counts that it wouldn't have allowed you to use a safe harbor on? The idea that these two agreements have to be considered together in order for the safe harbor to work, in part depends on whether the counts merged the two agreements insofar as what was charged. I think the safe harbor provision is relevant to both the conspiracy and the AKS violations. I think that the district court essentially said, you know, look, the reality is it was a payment per doctor's order. So I'm not going to let this in. The Hagins, again, I'm relying on the Hagins testimony. They said, we thought that was just not a guarantee, that that was a estimate. So really the BPO services were not based on a per doctor order basis. I think the instruction could have gone in and it would have just gone, the jury could have given it the weight that the jury thought it was appropriate. I think again, the problem I have is the district court kept saying, but it is a sham because Kimball testified that it was. And in fact, the district judge, and I get it, but she's repeatedly saying he's telling the truth and disregarding the Hagins testimony in these two evidentiary rulings. Morning. May it please the court. John Alex Romano on behalf of the United States as appellee. Beginning with the first issue, the district court did not abuse its discretion by excluding evidence concerning Koch and Spierder-Kimball's engagement of attorney Joshua Skora. The evidence was not relevant and to the extent it had any minimum probative value, that value was substantially outweighed both by the cumulative and potentially misleading nature of what Skora's testimony would have been. And the reason why the evidence is not relevant is because it did not have any connection to the Hagins. The Hagins did not retain attorney Skora, attorney Skora never met the Hagins. And in fact, it was Koch and Spierder-Kimball who retained Skora. But that's 18 months after the conspiracy in this case began and that's after. I'm sorry, Judge. Well, I mean, I was interested a little because the government moved in limine at the outset to exclude him on that theory, but the district court didn't accept it. Correct? On the theory. I think the initial challenge was that this is an advice of counsel defense in disguise. And then as Mr. Mickelson said, you know, the defense said, no, we're not trying to rely on it for advice of counsel. So I think that was the government's initial. What was the court's reason for not granting the motion at the outset if he had nothing to do with the contracts in the case? It said, and I don't think it was a definitive ruling at that point. I think it agreed that in fact, the Hagins were not trying to use the attorneys on their witness list for an advice of counsel defense. So I think that was the thrust of the district court's pre-trial ruling. But I think if you look at the wording of the ruling, the court says it will allow the testimony of the lawyers if admissible. So it's sort of, you know, putting a pin in it, if you will. And then, of course, there's Kimball had many lawyers, right? That's correct. I think there are a total of Unindicted co-conspirators? None. No, I do not believe so, Your Honor. And Kimball's testimony was that, you know, the lawyers were not in on this, that he engaged the lawyers, both at King and Spalding, and I think he's really referring to the attorneys at King and Spalding, not to Attorney Joshua Skor, but that he retained these lawyers to give legal cover to the conspiracy. So that, you know, if the conspiracy's operations came under scrutiny... He engaged sophisticated lawyers to give legal coverage to his conspiracy, but they were all duped? That is what he testified to, Your Honor, and I think that's what the evidence showed. And I think it's important to keep in mind what attorneys Skor... How is it possible, then, that the Hagins were equally duped as King and Spalding attorneys? One, because they were not similarly situated, okay? The Hagins were Kimball's customers. They were, they knew what they were getting from him. The attorneys are looking at this at a very different, from a different perspective. They're just looking at the contracts. And I think it's important to clarify, because I don't agree with my opponent's characterization of what attorneys Skor, what his proffered testimony was. He testified, to his recollection, that he was retained by Kimball to provide legal advice about prospective business activities. And again, this is 18 months into the conspiracy, about prospective business activities concerning a third party. Now, as part of that process of being retained by Skor, he did say, and this is at Record on Appeal page 5971, that as part of the process of getting to know a new client, he reviewed these contracts between Kimball's company and a third party called Rego Medical that were essentially the marketing and BPO agreements. But he was clear in saying that, because he was asked, and he said he did not provide advice or comments on those contracts. So, you know, it is not in the record of his proffered testimony that he was going to opine 18 months later on the same exact contracts. Kimball got how much out of this whole scheme? He was, the amount of kickbacks was $15 million, just over $15 million. Was he, was, I'm sure on a cross he was, what was his sentence in the end? Your Honor, I don't believe he was sentenced at the time of when he testified. And if I'm recalling correctly, his plea agreement was not with the office that I represented that prosecuted him. He, I believe he entered into that agreement with a U.S. Attorney's Office. If memory serves me correctly, in the District of South Carolina, I may not be 100% on that. And I think the prosecutors might have even said in closing that they didn't necessarily agree with that type of sentence that was, he was potentially eligible to get. So, the government recognized that. But that was fully aired before the jury. So, our first argument is that the District Court got it right in finding no relevance to this evidence. But even if there was some minimal relevance, it was cumulative. Let me ask you, to the extent the argument is that these contracts are identical, the ones that Skor examined and the ones that Hagan entered into. And Skor would have said that these contracts, in my review, were legal. There was nothing about them that struck me as being a sham. My friend on the other side, I did mention the problem with that may be that your evidence shows that's not what really was going on. But backing up from that, just that the lawyer looked at these contracts and these contracts look perfectly legal to him. Is that an advice of counsel defense? Because it doesn't, in this sense, it's not the same document, the same piece of paper, is not very convincing to me. Yeah, I don't think it's quite an advice of counsel defense, Your Honor. It sort of rings in that area. But the Hagans weren't taking the position that they knew, I mean, Michael Hagan did testify that, this is contrary to what Kimball says, that Kimball told him that he had had the contracts reviewed by lawyers. So perhaps in that sort of very attenuated sense, it gets to advice of counsel. But here... Why is that an improper defense so long as when the judge is looking at abuse of discussion, he decides that's not really relevant here because the evidence we're dealing with is that's not the reality of the transaction. But again, putting that aside, why would it, on what basis would you argue that it's improper that some lawyer signed off on the legitimacy of this contract? Because there's no factual connection to the Hagans. They weren't told, you know, they never met the attorney scora. They didn't retain him. So, you know, it's either, you know, if they need to either present the full-on advice of counsel of defense, which they disclaimed, but to rely on this sort of attenuated evidence, looking both sort of at the timing of when scora comes in 18 months later, what he's engaged to do. And I think we have to remember that the... Let me ask you that the 18 months, it seems like it was a fairly short term for this whole Hagan conspiracy that was charged. Was the Hagan event, the Hagan relationship with Campbell about to end by the time that scora looked at these contracts? No, it sort of gets, scora comes in, I think his engagement letter is November, early November of 2017, right before then, the one to two months before they signed a new set of contracts, the Hagans do. And the conspiracy goes on until early 2019. But, you know, all the contracts have been signed at this point. And just, if I could just make a point about why the excluded evidence was at best cumulative, and that's because Kimball was cross-examined extensively, and he was testified on cross-examination that he had lawyers prepare contract templates that were used for the marketing of BPO services contracts. In fact, that testimony is actually better than anything, I think the defense would have gotten out of scora. So all that was before the jury, and he also, and the lawyers who prepared the contract templates were from King and Spalding, and then he also testifies that, I also engaged later on, the law firm of K&L Gates, which was scora's law firm, to provide legal services. The defense was able to cross-examine Kimball about some communications that he had with his lawyers, although the communications themselves were not admitted into evidence. So all of that was before the jury.  defense, which was the that Kimball duped lawyers because he had lawyers prepare these contracts, vet them. And I also think there was a potential for this evidence to mislead the jury. When you're talking about a lawyer giving, being retained by Kimball, there was perhaps a risk that the jury might have believed that he had a stronger, scora had a stronger connection to reviewing the Hagen's operations with Kimball than, in fact, he did. And one final point on the exclusion of evidence is that, even if the court were to find that an abuse of discretion, which would mean that the district court had a clearly erroneous view of the evidence, which we don't believe it did, any error here was harmless. Herb Kimball's testimony that he was selling completed doctor's orders to the, to the Hagen's was corroborated by multiple pieces of evidence. For example, we can look at the email and Skype communications that were sent to the Hagen's. And we can look at the email and Skype communications between the Hagen's and Kimball, Kimball's wife, and his staff. And some of those communications are discussed on pages 8 and 9 of the government's brief. And they refer to, these are communications that refer to doctor's orders, or orders, not to raw patient leads, which was sort of the cover term used in the marketing services agreement. They refer, you see Leah Hagen sort of complaining about the fact that the Hagen's aren't, not getting the number of orders they need, and they're not getting credits for certain doctor's orders that proved problematic, that, you know, certain doctor order didn't support a reimbursable claim from Medicare. So why are these communications talking about credits if, under the marketing services agreement, there was no guarantee of, of getting a doctor's order? And you have, this is an email that we quote, a site on page 11 of our brief, it's at record ROA site 9870. It's an email from Kimball's wife to Leah Hagen early on in the conspiracy, and it lays out how the whole cover-up scheme works, how you, you figure out what the total charge is for a week's worth of doctor's orders. And then Kimball's wife explains, and you know, we have to bill this as 75% as marketing, 25% as BPO. It's a very incriminating email. And then you move on, and I'll try, and I won't belabor the point here, but you have, for example, a recording by Kimball that he makes surreptitiously, the conversation he has with the Hagens late on in the conspiracy, where Leah Hagen is boasting about grossing 12 to 15 million dollars in a given year, and then Michael Hagen quips, we're getting a little over-served, or words to that effect, and we'll take anything we can get. And he's referring to the doctor's orders, or at least the jury could, could reasonably conclude that. You have testimony by Kimball's brother, Raymond Shores, who met the Hagens when they were visiting Kimball in the Philippines, and he testified about a joke that they had about who was getting more doctor's orders from Kimball, his brother or the Hagens. And just my final point on this, the evidence also showed a spike in Medicare claims. Before, the year before the conspiracy began in 2015, the Hagens submitted only 200, approximately 200 Medicare claims. The next year after the conspiracy began in 2016, it goes from 200 to 6,000 Medicare claims. So we think, Your Honor, even if the evidence concerning SCORA, both the testimony and the documents, had been admitted, there was no substantial likelihood of the verdict being different here. What does the evidence show that the Hagens did with regard to money laundering and et cetera, how they handled the money? In terms of the evidence supporting the money laundering charge, Your Honor? And they were charged with conspiracy to commit international promotional money laundering, and the main evidence there was how they paid Herb Kimball. And that was by wiring him proceeds from the kickback scheme. And they'd be wired to offshore accounts. How did they do that? I'm sorry? How did they do that? The money was wired from their accounts in Texas to the the accounts in the Philippines of Herb Kimball's company, and they were, the wires were bifurcated, much as the invoices were here. You know, you had an invoice for a given week. You would have 75% of the amount that was charged for the doctor's orders would be charged, would be billed as marketing, and 25% would be billed as business processing, business process outsourcing, I think. So you'd have bifurcated invoices, bifurcated wiring, going over overseas to Kimball. Turning to the second claim, that is the denial of the requested instruction under the Safe Harbor regs pertaining to personal services contracts, the District Court did not abuse its discretion either in denying that instruction. The Hagans have conceded in their, in their briefing that the Safe Harbor instruction  and that's because the number of contracts that were issued and the number of raw leads that were, that sort of the methodology for payment under the marketing services contract was tied to the volume of raw leads generated, and that's inconsistent with one of the regulatory provisions that has to be met. But the BPO agreement did not warrant the Safe Harbor instruction either, and the first point I think that it's important to emphasize is that the arguments that were made here on appeal that are being made, that an instruction should have been given just as the BPO argument, was not the arguments that were made for the District Court where the Hagans argued that both contracts required a jury instruction on the Safe Harbor. And the reason why it's problematic to only give an instruction on the BPO agreement is that it's inconsistent with the requirement that the services that the agent is providing to the principal. The evidence was that these two contracts, you know, under the cover-up theory that Kimball and the Hagans had, these two contracts worked in tandem. Part was marketing services, the other part was billed as BPO, and the evidence, I think, was undisputed that Kimball controlled both of his companies, both Kronos and Pantheon, even though it is true that at a given time you had one company, Kimball company, being in one contract, and the other Kimball company being on the other contract, but he controlled both companies. They were both his companies. So, you know, giving an instruction only on a BPO agreement would violate the requirement of the reg in subsection D1 Romanet 2, that the agreement cover all the services. It also fails to comply with a requirement because that the methodology for payment of the contract is consistent with fair market value in an unselected transaction. The Hagans did not adduce evidence of fair market value. There was some passing testimony that the amounts charged under the BPO agreement were cost-effective, but that's not the same as fair market value. And you also have another requirement that was not met, which is that the BPO agreement did not, in the government's view, at least fully specify the services that were to be provided. If the court looked at the statement of work, which is an addendum to the BPO agreement, it sets out what Kimball's company were to do. There are some vague terms or references to instructions and requirements that the Hagans' companies were to provide that really leave some areas undefined in the government's view as to what Kimball's company would be providing. Even if all of the requirements of the reg itself were satisfied, though, the denial of the instruction was not an abuse of discretion because it did not seriously impair the Hagans' defense. They were able to put on their defense that these contracts were legitimate and that they believe they were legitimate. They testified to that. They cross-examined Herb Kimball extensively, almost provision by provision, about these contracts. They were able to argue in closing that the contracts were legitimate, or at least they believe they were legitimate. And finally... They got a good faith instruction? Yes, Your Honor, and that sort of leads me to my final point. Over the government, the government didn't agree that they should get a good faith instruction, but they got one. And so that would have allowed the jury to acquit them if it found that the Hagans had an honestly held belief. The jury found otherwise. They, in fact, found notwithstanding the defense that the Hagans put on that the Hagans acted willfully with the intent to engage in conduct that the law prohibited. So we think any error in denying the requested instruction was harmless. Unless this Court has any additional questions, we'd ask it. One on the enhancement. The commentary does require to get the sophisticated laundering enhancement. It can't be based on the same conduct of the 1956 offense, right? It cannot be based on the same conduct for which an enhancement was applied as to the underlying offense. Yes, but it seems like the underlying offense was all about the Philippines and the offshore. Well, you look at what the enhancement, the enhancement that was applied to the underlying offense, and the only enhancement that was applied to the underlying offense was the 20-level enhancement based on the gain, the amount of the Hagans' unlawful gain. So that measures the volume of what they're getting out of the scheme. The sophisticated laundering enhancement that was applied, it was applied first and foremost to the payments that the Hagans were making to Herb Kimball and the manner in which they were making the kickback payments to him. So that's targeting the money that they're sending over to Herb Kimball, then Herb Kimball gives them doctor's orders, which then they then use to submit Medicare claims, and then Medicare pays out a total of $24.5 million on all those claims. So it's targeting the sophisticated laundering enhancement and the improper benefits enhancement are targeting two different pieces of conduct. And this Court said in the Reyes case, I believe, it's an un... The Reyes case? That's the clearest explication. Of the distinction. I think so. What Reyes says is the purpose of commentary note 5B is to prevent a defendant from receiving the same enhancement, the same enhancement for the underlying conduct and the laundering. And you don't have that here. And we've also cited other cases in the double-counting context that reject, doesn't involve this particular guideline, but it's still a double-counting claim. And the courts rejected a double-counting challenge to a sophisticated means enhancement and amount of loss enhancement. And those cases which we cited in our brief are Hatala out of the Second Circuit, Short out of the Tenth Circuit, and we've also cited some cases from this Court in the double-counting context, not involving sophisticated means, but still that make the point that it's okay to apply two different enhancements that target different conduct. And the cases out of this circuit are the Scurlock and Estrada in addition to the observation in Reyes that I mentioned. Thank you. Thank you. I would like to briefly address the two-point enhancement for sophisticated money laundering. I think the contention in short was there are three ways the government said there was sophisticated money laundering. One was the payments to Kimball's organization were an element. That's how they proved the money laundering count itself. Two, they contended that it was sophisticated because it was essentially upfront payments for the services. And three, because the Hagens wired the money to their banks in Europe, their profits to the banks in Europe. I think the issue that I have is number three, of course, Michael Hagen was Austrian. They had a home in Spain. These wires to Europe were made in their names to ordinary banks. I don't think that should, in fairness, be considered sophisticated money laundering. The issue that I have with the wires to the Philippines and the upfront payments is the distinction. I believe because the guideline note says if the conduct is the subject of the enhancement for the underlying offense, the conduct, except in the government's case, the conduct of wiring the money to Europe and making the upfront payments is the fraud. It's inextricable from the fraud. And the fraud enhancement then applies the loss amount. I frankly don't think, there's double counting cases. I don't think this court has addressed this specific issue. And frankly, I hadn't found a court that has. But I think that's my, the word that I'm emphasizing there is the word conduct. And then briefly back to Attorney Josh Gore's testimony. The government describes it as cumulative. It is true that Mr. Kimball said, oh yes, I consulted with attorneys. You know, basically, I didn't tell him what was really going on. It was all, you know, all this was just done to have a patina of legitimacy. I think frankly that there is, that is true. He did say that. But to actually have a well-respected man like Josh Gore with his credentials and his experience say, I was looking at these contracts. I saw the television ads. I knew what was going on. It did not appear on its face illegal, was very important, would have been important for the jury. In fairness, the government could have cross-examined and I can anticipate where that cross-examination would go. But you did not know how the payments were really being made and structured, in fairness. But I think that was something the jury should have weighed. Related to that is the safe harbor issue in this sense. The Higgins were precluded from testifying that they believe this, the BPO agreement or the marketing agreement for that matter, was subject to the safe harbor provision. And I think that's another reason why it's important for them to have that instruction because again, the government can say, hey, you didn't meet the preponderance or, but to actually just remove the issue 100% from the jury, I think was unfair. Thank you. Thank you. All right, counsel. Thank you both for your explanations to us today. That is the final case of this panel. So we are adjourned.